May it please the Court, I'm William Hanagami, attorney for the appellants and relators Marcia Stein and Rudolfo Bohn. The first issue presented here is whether or not the first-to-file rule under the False Claims Act is jurisdictional or not. Since the U.S. Supreme Court in various decisions, such as the Thaler-Gonzalez case and its progeny, have set forth the clear statement principle in which when courts interpret whether or not a rule or a statute is jurisdictional or not, that you must take a look to determine whether or not Congress, in formulating the statute, has declared that that rule or statute is jurisdictional. So how do you get around Hart-Pence? I mean, I understand and appreciate your argument, but we have binding authority from an en banc panel that says it's jurisdictional. That's right. And we're about eight judges short of reversing that. That's right, and that is why we have cited in our briefs that one of the remedies here is for this panel to refer this matter. No, you can't. You know, you didn't petition for initial hearing en banc. We could sui spani request it, I guess, but you would agree that Hart-Pence is binding on us unless we declare it overruled under Miller v. Gammie or the en banc panel does, right? I concur. Okay. Nevertheless, the first-to-file rule, when analyzed using the Supreme Court's clear statement principle, is not jurisdictional. I want to move on to the issue beyond jurisdiction. I want to go now to the first-to-file rule's application to the various False Claims Act claims presented by the appellants in this case. I'm sorry. Can I stop you for one second? Has our video cut out entirely? No. It's just not showing? No. Okay. I'm sorry. I think the microphone needs adjustment too, but, yeah, go ahead. Should I speak closer? No, just pull it a little bit, but I think we're having a technical problem. Yeah, thank you. Is it too loud or too quiet, Judge? Go ahead. Is the microphone too loud or too quiet, Judge? It's too soft, Sam. Okay. I'll turn it up. Thank you. Sorry. Go ahead. Thank you, Your Honor. So addressing the appellant's False Claims Act claims, one of them was what we called the refresh claim, which was also alleged in the first-filed action by Ocenic. That one, and the reason I'm going through this, is it's important to understand what the prior claims were about to see whether or not the material facts of the Ocenic claim overlap with the material facts of the remainder of my client's claims. The refresh claims were based on historical risk adjustment or diagnoses. The way that worked was Kaiser utilized the prior year's HCC or hierarchical chronic condition diagnoses from the patient's prior year. Then, during the current year, looked to see whether or not those patients had been re-diagnosed with those same diagnoses, because that would then increase the capitated payments paid by the government to Kaiser the following year. So by using computer programs, Kaiser went out, figured out, okay, of the prior patients who had these various diagnoses we call HCC diagnoses that increased capitated payments, they figured out by computer, well, here's a list of the patients that have already been seen by our doctors. And of those patients that have been seen thus far this year, here's the diagnosis codes that are missing as compared to the prior year. Plus, they developed another list that shows, well, we haven't seen these other patients this year that had HCC diagnosis codes this year. And so with these two lists, they gave these lists to the Kaiser primary care physicians to then go out, try to get these people in, or if they couldn't, to at least amend this year's medical charts so that it looked like they had been re-diagnosed, but without a face-to-face visit. So I understand that the allegations that are being made in this case, in the Stein case, are not exactly the same as the allegations in the prior cases, but the law doesn't require that. So why isn't this case more like Lujan than like Hart-Pence? It's more like Hart-Pence because of the material facts case. In Lujan, you had a number of contracts involving one particular defense item where they were mixing or moving various costs amongst these, I believe it was four different contracts. And those were the basis of Lujan and the first filed decision. Hart-Pence, our case is more like Hart-Pence. Hart-Pence actually involved the same mechanical device, but used different fraudulent schemes to overcharge Medicare. In our particular case, we have what we call risk adjustment fraud. Unlike standard, original Medicare fee-for-service fraud, where you're sending bills for services that you did not perform or that shouldn't have been provided in the first place, Medicare Advantage fraud involves risk adjustment fraud, which is submitting diagnosis codes that were not valid or supported by properly documented medical charts or used improper methods to get those diagnosis codes, such as, for instance, coders instructing the health care provider to put in certain types of diagnoses into the medical chart, that kind of thing. But some of those processes that you're complaining about in this case were at issue in the prior cases, including, you know, going back and amending diagnoses without face-to-face interactions. So why isn't it? I mean, it seems to look a little bit like Lujan to me. Well, actually, I don't agree with that, Your Honor. And the reason is that the methodology, the way the fraud was committed, is different. In other words, when we look at, for instance, the sepsis fraud claims that appellants have alleged, that has nothing to do with refresh fraud. Refresh fraud, they're looking at the prior year's diagnoses and then trying to bring it forward by having the doctors this year amend the medical charts. With respect to sepsis fraud claims presented by the appellants, there is no prior history that they're trying to update. No. This is contemporaneous with when the patient comes into the hospital. The doctors are instructed to use certain types of criteria to be able to diagnose sepsis, which we contend was improper. And then secondly, what they did was after they had the patient sit in the hallway without admission to the ICU or the hospital, they'd run blood tests. And when blood tests came negative for sepsis, they went ahead and discharged the patient without withdrawing the sepsis diagnosis code. This has nothing to do with the fact of a prior, you know, specific patients for a risk adjustment fraud. No. This was a practice used in the ERs over at Kaiser to be able to submit improper sepsis diagnosis codes and then, after it's been ruled out, to refuse to withdraw it. Let's get to the second claim, which is malnutrition. Malnutrition, back in the days before Kaiser utilized electronic medical records, just as we had with kids, the health care providers used pen or pencil to paper, okay, and used paper records. Here, what we got with malnutrition is dieticians who are not authorized or permitted to make diagnoses had a rubber stamp and would stamp the medical record and say, malnutrition. And then, later, the chart would be reviewed by a physician who would simply sign it without any clinical findings. Okay? Again, that is not a properly documented medical chart for purposes of diagnosing or submitting a diagnosis of malnutrition. Has nothing to do with computer programs and all of that stuff and prior history, all that. The third one, which is aortic, I always have a problem with this word, atherosclerosis. I'll call it AA for short. That was based, those frauds were committed by coders reviewing X-ray reports, radiological reports, and they were not supported by any clinical findings. You cannot submit to Medicare risk adjustment data, including diagnosis codes. They're based solely upon a review of a radiological report. That is, again, a submission of an improper diagnosis to Medicare. And these are the three types of frauds which are materially different, based on materially different facts from what was alleged in the prior complaints. And that last one that you just described, we only consider that one if we look at your amended complaint, correct? That is true. But I would like to point out that even Hartpence, which did say or did assume that the first-to-file rule was jurisdictional, even Hartpence looked at the amended complaints, not the originals. Third point I want to make very briefly is the leave to amend. And this is really tied, I believe, to the jurisdictional issue. So we think that the district, excuse me, we believe that the district court improperly failed to allow us leave to amend, as this particular motion to dismiss based, the jurisdictional motion to dismiss was the first attack by the defendants against our QTAM action. Do you want to reserve some time for rebuttal? I would. Thank you very much, Your Honor. Good morning. Dimitri Portnoy, O'Melveny & Myers, on behalf of Appellees. May it please the Court, this Court should affirm that district court's dismissal of the Stein and Bone FCA action to the first-to-file bar. I'm going to address a few things that I heard, one of which is the jurisdictional question. And one issue with the jurisdictional question is that it's only one of several reasons why you look only to the first complaint and why you don't grant leave to amend, as was stated, which is that we also, and this, I believe, is around page 24 of our answering brief, make the point that regardless of jurisdiction, the text of 3730b5 states that you have to, that you cannot bring in action unless you have, unless you, when there's a prior filed action that is related or it has the same material facts. Regardless of jurisdiction, you cannot bring in action, and as a result, that textual argument means that you look to the original complaint and, in addition, the statutory bar, irrespective of jurisdiction. I think you have a good textual argument, but I think you have a problem with Hart-Pence. I mean, this is what it says in Hart-Pence. For purposes of determining jurisdiction, we look to the allegations in the amended complaints. Absolutely. And as Judge Chen found below, that footnote is in the section of the public disclosure bar, which has exceptions unlike the first-to-file bar. And also, what was at issue in the public disclosure section of Hart-Pence was the question of whether or not when a plaintiff or a relator, in this case, withdraws allegations in an amended complaint, can they withdraw allegations in such a way that takes jurisdiction away. I understand that, but there's nothing in the language that cabins that statement to the public disclosure bar and says it doesn't apply to the first-to-file bar that we're looking at. Both of those were at issue in Hart-Pence. So, I mean, I understand the point, but it's a broad statement. For purposes of determining jurisdiction, and we said in that case that the first-to-file bar is jurisdictional, that we look at the amended complaint. So whether that was right or wrong as applied to the first-to-file bar, how do we — isn't it binding on us? Well, it's binding, but we have to understand what it means. It — to the extent that it is not saying whether they're talking about the public disclosure bar or the first-to-file bar, it is ambiguous, and we have to look to what is, at that point, was that something that was briefed? Was that something that is consistent with the statute or consistent with any number of other circumstances where jurisdiction is addressed at the time of the filing of a complaint? Doesn't the record in that case indicate that when it got to the first-to-file bar, the Court actually did look at the amended complaint? I'm not certain whether — when it got to the first-to-file bar, it did, and I'm not certain whether that issue was briefed at that time or contested. It was really the only place where there wasn't anything that demonstrated it was contested was on the issue of the — of that — of the public disclosure bar. In any event, Judge Chen also looked at the AA allegations and found that they also are similarly subsumed by the Osinek complaint, the Taylor complaint, and the Arefi complaint. And as a result, even if you get to that point, the AA allegations don't add — don't add anything that expands the nature of the scheme. And in fact, when we consider AA, as my friend Mr. Hanegami said, this fraud had to do with looking at radiologic or lab reports, and we see in the Osinek complaint — or, sorry, in the Taylor complaint at paragraphs 153, 154, and 51, we see looking at diagnostic radiology services, looking at radiologic and lab tests, and diagnostic radiology reports. And then when we look at the Arefi complaint, we see at paragraph 33 almost the exact same allegations. So the AA allegations don't — don't do much. And in addition, that idea of every court, whether they have found — found it — whether they have found that there's a jurisdictional bar or a textual bar have all consistently denied leave to amend across the different circuits that have looked at it because of the textual bar that you cannot bring in action. If you cannot bring in action, amending is not going to help you to get there. I also want to address some of the other things on the substance of the three complaints. Mr. Hanegami, in the papers in here, makes a lot about the idea that the Osinek complaint is focused on refresh and addenda. Judge Chen looked at the four complaints and, in fact, looked at the two later filed or later complaints. Six complaints side by side to figure this out. And in reviewing the Osinek decision over the course of a 52-page opinion, I believe, really came to the conclusion that Osinek was not limited to refresh and addenda because it, quite frankly, isn't. The Osinek complaint is focused on much broader issues and is focused on fraud that relates to diagnoses that are not factually true, that diagnoses that didn't affect treatment or care, diagnoses that were not documented as a result of face-to-face visits, diagnoses that were not that or that diagnoses that were made by the wrong provider type. Moving from Osinek and going to the Taylor complaint, we have even much more specific and focused allegations on those exact points and are really our focus there. And I believe that we don't start to see refresh allegations in Taylor. They appear to be two paragraphs. At paragraphs 179 and 180, the entire rest of the complaint has nothing to do with refresh. The entire rest of the complaint has to do with many different kinds of frauds, some of which are alleged to take place in the hospital setting, some of which are alleged to take place in the outpatient hospital setting and the inpatient hospital setting. The Arefi complaint, which, again, is also earlier filed, does not use the word refresh, does not use the word addendum. It simply is not what that complaint is about. It is about that list of issues where the ICD guidelines are violated because what you don't have, what is alleged to not be here, is a large scheme that is that attacks whether or not there was a valid diagnosis that was really true, that was assessed by the doctor at a face-to-face visit, that affected treatment and was made in the proper year. And, again, just I believe I made the point earlier with respect to leave to amend, but leave to amend in addition to the fact that the bring to bring an action issue on the text would take leave to amend off the table. I'd also say in the briefing here, in the briefing below, we've never had any proposal about what actual factual allegations could be added to the complaint to cure anything. And there's been opportunity to do that below. There's been opportunity to do that in the briefing here. Unless there are other questions, I would ask that the Court affirm Judge Chen's careful decision in this matter. Thank you. Thank you for your argument. I just wish to make a couple of points in reply or rebuttal here. And that is the purpose of the first to file rule, which is to prevent opportunistic claims without stifling the incentives for whistleblower insiders. And that is what the district court's opinion effectively does. But because what it's basically saying is, is that all of these claims have to do with risk adjustment fraud, the improper submission of diagnosis codes. But when you apply the material facts test, what I see is that the three frauds that I'm talking about, not our refresh fraud claim, which we acknowledge is barred by the first to file rule, but that our other three claims, which are the subject of this appeal, that the district court's order effectively stifles incentives for insider whistleblowers, such as my clients, from presenting their False Claims Act claims. One of the hallmarks of looking at the first to file rule is whether the government would or would not have discovered these frauds, the AA, the sepsis, and the malnutrition claims. And I submit that the prior key TAM actions, which were based on the refresh frauds, would not have disclosed the rubber stamping of the malnutrition claims or the improper use of sepsis protocols to improperly diagnose sepsis. And then after blood tests ruled out the sepsis, that they refused to withdraw those diagnoses. And then likewise with the AA claims, so far as the use by Kaiser of looking at radiological reports that would not likely have been discovered based on the prior complaints. Therefore, the first to file rule, whether jurisdictional or not, should not have barred my clients' three claims. There are no further questions. Thank you very much, Your Honor. I thank counsel on this matter for a helpful argument. The case of Stein v. Kaiser Foundation Health Plan is submitted.
judges: Boggs, THOMAS, FORREST